**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
|  | : |  |
| UNITED STATES OF AMERICA, | : |  |
|  | : | Criminal Action No. 16-449 (FLW) |
| v. | : |  |
|  | : | **AMENDED OPINION** |
| THEODORE L. CLARK, III. | : |  |
|  | : |  |

---

**Hon. Freda L. Wolfson, U.S.D.J.:**

Before the Court is the motion of Defendant Theodore L. Clark, III ("Defendant"), to suppress the evidence — a handgun — seized during a February 21, 2016 traffic stop as obtained in violation of Defendant's rights under the Fourth Amendment to the United States Constitution. For the reasons stated below, the Court finds that the traffic stop of the vehicle in which Defendant was traveling as a passenger, was unconstitutionally extended in violation of Defendant's Fourth Amendment rights. The evidence, *i.e.* the handgun, seized after the point at which the arresting officer lacked reasonable suspicion to investigate non-traffic-offense-related criminal activity, therefore, shall be suppressed.

I. FACTUAL BACKGROUND

On February 21, 2016, shortly after midnight, Edison Police Officer Daniel Bradley ("Officer Bradley") stopped a minivan operated by Donald S. Roberts ("Roberts") for motor vehicle offenses, including driving at night without headlights, driving while using a cellular phone, and driving with an obstructed view. Defendant was a passenger in the minivan. The dashboard camera of Officer Bradley's patrol car recorded the stop, which lasted approximately twenty-three (23) minutes from Officer Bradley's arrival at the minivan's driver-side window to the discovery of a handgun and marijuana blunt on Defendant's person. The Court has reviewed

a forensically enhanced version of the recording, and relies upon the depiction of events therein in its consideration of the present motion.

After pulling over the minivan, Officer Bradley, standing by the open driver-side window, sought credentials from the driver, Roberts. Dashboard Camera Video ("DCV") 00:10:30. Roberts quickly located his driver's license and insurance information, but could not locate the minivan's registration. Officer Bradley waited calmly by the driver-side door of the vehicle while Roberts searched for the registration. While searching for the registration, Roberts advised Bradley that the van belonged to Roberts' mother and offered to call her to determine the whereabouts of the registration. *Id.* at 00:11:05; 00:11:45; 00:12:07. During this time, Officer Bradley also informed Roberts that he had been stopped for driving with his headlights out, using his cellphone while driving, and driving with an obstructed view. *Id.* at 00:11:48. Because Roberts was still unable to locate the vehicle's registration, Bradley took possession of Roberts' license and insurance identification, and walked around the rear of the vehicle to observe the license plate in order to run a computerized check of the registration. *Id.* at 00:12:18. Officer Bradley then returned to his patrol car and entered Roberts' information and the minivan's license plate number into his mobile data terminal.[1] Officer Bradley was in the patrol car for approximately four and a half minutes. *Id.* at 00:12:22-00:16:44. During the time in which he was in the patrol car, Officer Bradley deactivated his body-worn microphone.

Officer Bradley's mobile data terminal search revealed that Roberts' license was valid, that he had a criminal record, including drug offenses, and that he had no outstanding warrants for his arrest. Roberts' license was valid until February 29, 2020, listed his name as Donald S.

---

[1] This remote portable computer permits access to the records of the New Jersey Motor Vehicle Commission as well as those of the New Jersey State Police State Bureau of Investigation Criminal Justice Information System.

Roberts, and listed his address as 33 Commercial Avenue, Apt. 3C, New Brunswick, NJ 08901. Edison Police Department CAD Incident Report #16008625, dated February 21, 2016. Motor Vehicle records reflect that the vehicle was registered to Kathy L. Roberts at 33 Commercial Avenue, Apt. 3C, New Brunswick, NJ, 08901.[2] NJ Motor Vehicle commission Title/Lien Certification, dated May 17, 2017, MVC Reference # 30805. Furthermore, there appears to be no dispute that Officer Bradley's title search of the minivan's license plate on the night of February 21, 2016, revealed this information to him. Officer Bradley reactivated his microphone and approached the driver-side door to begin his interrogation. DCV 00:16:44-16:54.

Officer Bradley first asked Roberts about Roberts' criminal record, asking him whether he had ever been arrested, for what kinds of crimes he had been arrested, and for the date of his last arrest. Roberts responded that he had been arrested for drugs and a "CDS," with the last arrest taking place in 2006. *Id.* at 00:16:54-17:14. Officer Bradley then asked Roberts from where Roberts was coming. *Id.* at 00:17:14. Roberts explained that he was coming from his mother's house. *Id.* at 00:17:16. Bradley asked Roberts to confirm that his mother's house was located in New Brunswick, *id.* at 00:17:19, consistent with the title search record showing a registered owner sharing Roberts' last name at the address in New Brunswick also listed on Roberts' driver's license. Roberts did not answer Bradley and instead began speaking to someone on his cellular phone. Speaking aloud, as if on speakerphone, Roberts stated "Mom, you on a three-way." *Id.* at 00:17:23. Having not received an answer to his previous question, Officer Bradley again asked Roberts to confirm that he was coming from New Brunswick. *Id.* at 00:17:27. At this point, Roberts became agitated, and, again speaking in a loud voice, but not

---

[2] At the May 10, 2017 hearing in this case, the Court had not yet been provided with the results of Bradley's title search of the minivan Roberts was driving. The results of the title search became a key question of fact during oral argument, as explained, *infra*.

3

directed at the officer, stated "He's asking me questions about when have I ever been arrested before; where were you coming from. And I told him I'm coming from the QuickCheck and before that was in Plainfield." *Id.* at 00:17:30. Although Roberts contended to the person on speakerphone that he had already told the officer that he was coming from Plainfield, this is the first time that Plainfield was mentioned during the stop. Officer Bradley then asked Roberts if the minivan belonged to Roberts' wife.[3] *Id.* at 00:17:52. Roberts, still sounding agitated, stated that the van belonged to his mother, that his mother was the person on the phone, and that his mother lives in Plainfield. Officer Bradley asked for confirmation that the address was in Plainfield and not New Brunswick. *Id.* at 00:18:07. A female voice audible from Roberts' cellular phone then stated that the problem was that she did not change her address on her registration.[4] *Ibid.* Roberts then told Officer Bradley that the officer's questions were confusing him. *Id.* at 00:18:09. Officer Bradley stated that he too was confused, and then calmly explained his reasons for questioning Roberts. Bradley explained that he had reviewed Roberts' criminal

---

[3] Officer Bradley's question whether the minivan was registered to Roberts' wife further supports a finding that he was aware that the title search had returned a valid registration to a woman sharing Roberts' last name.

[4] At oral argument, Defendant and the Government disputed whether at the time the female voice on speakerphone explained that she had failed to change her address on her registration, causing the confusion about whether she lived in Plainfield or New Brunswick, Officer Bradley reasonably should have understood the voice to be that of Roberts' mother. Defendant contended that her identity was established by the surrounding context, while the Government contended that Officer Bradley had no reason to know the identity of or credit the statements of an unknown female voice corroborating Roberts' story, who may have simply been a wife or girlfriend following Roberts' lead. In light of the results of the title search, which have been provided to the Court since oral argument, the Court agrees with Defendant that Officer Bradley should have understood the voice on the phone to be that of Roberts' mother or at least would have had sufficient reason to further inquire into that person's identity, given that Roberts had offered to call his mother to find out the whereabouts of the registration, DCV 00:12:07, the title search, conducted at DCV 00:12:22-00:16:44, revealed that the minivan was registered to a woman sharing Roberts' last name and address, and the voice on speakerphone referred to changing her address on her registration. *Id.* at 00:18:07.

record, that he was trying to understand Roberts' trip itinerary, namely where he was coming from, and that he had asked additional questions in order to judge Roberts' truthfulness. *Id.* at 00:18:15-00:19:27. Bradley then asked Roberts if he had any outstanding warrants for his arrest, or outstanding parking tickets, and Roberts explained that he had just been released from prison on December 2, and that he had no outstanding warrants or other issues. *Id.* at 00:19:27-00:19:56. Bradley asked Roberts how many times Roberts had been arrested. *Id.* at 00:19:56. Roberts became audibly frustrated and asked "What is that for?" at which point Officer Bradley asked Roberts to step out of the vehicle. *Id.* at 00:19:56-00:20:07.

Roberts complied with the request, and Bradley and Roberts walked to the back of the minivan. Roberts was not restrained and the body language of both men remained relaxed. At the rear of the minivan, Officer Bradley explained that he had run Roberts' license, had checked him for warrants, and had told Roberts why he had been stopped. *Id.* at 00:20:07-00:20:44. Officer Bradley then asked a series of questions about Roberts' passenger, including asking for the passenger's name, the length of Roberts' acquaintance with him, and how they came to travel together. Roberts stated that his passenger's name was "Tyron [sp]," but Roberts did not know is last name, DCV 00:20:44; that Roberts and his passenger had not been friends long, *id.* at 00:20:58; and that Roberts had picked up his passenger earlier that night in the Potters community in Edison Township, New Jersey, *id.* at 00:21:11.

Officer Bradley then approached the passenger's side to question the Defendant, leaving Roberts unrestrained behind the vehicle. *Id.* at 00:21:48. Roberts appeared relaxed and was using his cellular phone. Officer Bradley waited outside the passenger-side door of the minivan as Defendant attempted to roll down the window. Defendant was ultimately unable to roll down the window and opened the door, while remaining seated inside the vehicle, in order to speak to

the officer. *Id.* at 00:22:07-00:22:10. Officer Bradley smelled a strong odor of marijuana coming from the passenger's side of the car. He then proceeded to ask Defendant a series of questions, to which Defendant responded with his full name, DCV 00:22:20; Roberts full name, *id.* at 00:22:53; that he had known Roberts "a long time," *id.* at 00:22:25; that he and Roberts were coming from Roberts' mother's house, where Defendant had stayed over the previous night, *id.* at 00:22:55; and that Defendant had never been arrested before, *id.* at 00:24:09.

Officer Bradley then returned to the rear of the vehicle to speak with Roberts. Bradley informed Roberts that he and Defendant had given conflicting accounts and asked Roberts why he had lied. *Id.* at 00:25:05. Roberts denied lying and attempted to explain the route itinerary. *Id.* at 00:25:20-00:27:08. Bradley then informed Roberts that Bradley had smelled a strong odor of marijuana from the passenger's side of the car, but that he had not smelled anything from the driver's side.[5] *Id.* at 00:27:08. After speaking with Roberts for a couple of minutes, Bradley announced to Defendant that he would have to get out of the van, because the police intended to search it. *Id.* at 00:29:09. Bradley and his partner, who had been waiting silently by the passenger's side of the vehicle throughout the stop, then asked Defendant to turn around for a pat-down. *Id.* at 00:31:38. Defendant complied, and informed the officers that he had a handgun in his waistband. *Id.* at 00:31:55. The officers removed the gun, a 0.357 caliber Smith and Wesson revolver loaded with six rounds of ammunition, and a "blunt" (brown tobacco leaf wrapped around marijuana) from Defendant's person, ending the portion of the stop relevant to this motion. *Id.* at 00:31:56-00:32:03. Defendant was subsequently taken into custody. *Id.* at 00:52:34. Roberts was permitted to leave after having been issued summons for driving without

---

[5] Bradley declared on three occasions that he had not smelled marijuana while leaning into the driver's side of the minivan. *Id.* at 00:27:08, 00:30:33, 00:35:00.

headlights, using a cellphone while driving, and obstruction of view. *Id.* at 01:00:00, 01:06:00. No summons was issued relating to the registration of the minivan

## II. PROCEDURAL HISTORY

Defendant was first charged in Middlesex County with possession of marijuana, unlawful possession of a weapon, and certain persons not to possess a weapon. At the same time, Defendant received notice of a parole violation based on the same conduct and was remanded to East Jersey State Prison. Thereafter, he had his parole revoked.[6] About seven months after the arrest, the United States Attorney for the District of New Jersey sought an indictment charging Defendant with possession of a weapon as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Defendant was indicted on September 30, 2016, by a federal grand jury in Newark, New Jersey, on one count of possession of a weapon by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

On March 10, 2017, Defendant moved to suppress the evidence of the gun seized from him. Defendant argues that law enforcement impermissibly prolonged the traffic stop of the vehicle driven by Mr. Roberts in which Defendant was a passenger, such that any evidence recovered thereafter, including the gun recovered from the Defendant during the pat-down, should be suppressed as fruit of the poisonous tree under the Fourth Amendment to the United States Constitution. Specifically, Defendant contends that the motor vehicle stop was legally concluded at the moment when Officer Bradley returned to the minivan after having run Roberts credentials and the minivan's license plate, DCV 00:16:54, and any questioning after that point,

---

[6] A revocation need not await disposition of the underlying criminal case. Furthermore, the Fourth Amendment's exclusionary rule does not apply to a revocation proceeding. *See Pa. Bd. of Prob. & Parole v. Scott,* 524 U.S. 357, 363 (1998).

including Bradley's initial questioning of Roberts concerning his prior arrests, unconstitutionally prolonged the stop. Mot. Br. at 6, 7.

The Government opposed Defendant's motion on April 7, 2017. The Government argues that the stop was not unconstitutionally prolonged because Officer Bradley possessed reasonable suspicion to continue questioning at all times, including his initial inquiry into Roberts' criminal history at DCV 00:16:54.

The motion came before the Court for a hearing on May 10, 2017. The Court heard oral argument from the parties concerning the applicable legal standard for the constitutional extension of traffic stops after the Supreme Court's decision in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), and concerning the application of such standard to the facts of this case. The Court noted on the record that it was not disputed by the parties that Officer Bradley developed reasonable suspicion to continue questioning Roberts and Defendant at some point during the traffic stop, but rather only contested at which point such suspicion accrued and whether the traffic stop had been unconstitutionally prolonged to reach that point. The Court then found various points during the stop at which reasonable suspicion accrued.

The Court reserved judgment on Defendant's motion, however, because the factual record before the Court at the hearing was incomplete as to the results of Officer Bradley's title search. The Court was initially inclined to reject Defendant's argument that the traffic stop was complete at 00:16:54, when Officer Bradley first returned to Roberts' vehicle, because Roberts had failed to provide a valid registration, so Roberts' right to drive the vehicle remained in doubt. *See, e.g.*, *United States v. Frierson*, 611 F. App'x 82, 85 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 1159, 194 L. Ed. 2d 187 (2016) ("it was reasonable . . .to delay the stop in order to investigate who was authorized to drive the  . . . car" because inquiries meant to ensure that vehicles on the

road are operated safely and responsibly are part of an officer's mission in conducting a traffic stop) (citing *Rodriguez*, 135 S.Ct. at 1615)); *United States v. Robinson*, 529 F. App'x 134, 138 (3d Cir. 2013) (*inter alia*, vehicle's third-party ownership, and discrepancies between state address of driver's license and registration created reasonable suspicion of other criminal activity); *United States v. Caraballo*, 104 F. App'x 820, 822 (3d Cir. 2004) (inconsistencies in state address of driver's license and registration provided by driver to state trooper created reasonable basis for continued questioning on ownership and use of the vehicle). Defendant represented on information and belief that Officer Bradley's title search based on the minivan's license plate returned a valid registration in the name of Roberts' mother, who shared the same last name as Roberts. Counsel for Defendant represented that she had not yet been able to obtain the results of the search in discovery. The Court reserved decision on the motion and instructed the parties to supplement their briefing once the results of the title search were produced to Defendant.

On May 22, 2017, Defendant submitted a letter brief attaching a Title/Lien Certification from the New Jersey Motor Vehicle Commission, certifying that the minivan Roberts was driving was registered to Kathy L. Roberts at 33 Commercial Avenue, Apt 3C, New Brunswick, NJ 08901. Also attached to the letter is Edison Police Department CAD Incident Report #16008625, the report for the February 21, 2016 traffic stop involving Roberts and the Defendant. The Report indicates that on the night of the incident, Roberts produced a valid New Jersey Driver's License, # R 60181738206812, which listed his name as Donald S. Roberts, and his address as 33 Commercial Avenue, Apt 3C, New Brunswick, NJ 08901, the same last name as appears on the registration and the same address as listed for the owner. On May 31, 2017, the Government responded by letter brief, conceding the authenticity of the documents and the truth

of their contents, but arguing that the totality of the circumstances nevertheless established reasonable suspicion for the extension of the stop.

III. ANALYSIS

The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *Coles v. Carlini*, 162 F. Supp. 3d 380, 391 (D.N.J. 2015) (quoting *Delaware v. Prouse,* 440 U.S. 648, 653 (1979)). "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson,* 305 F.3d 164, 167 (3d Cir. 2002) (citation omitted). "A well-established exception to the Fourth Amendment's warrant requirement permits an officer to 'conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio,* 392 U.S. 1, 30 (1968))). *See Lewis*, 672 F.3d at 237 ("The requirement of reasonable suspicion for a *Terry* stop-and-frisk applies with equal force to a traffic stop of a vehicle.") (citing *United States v. Delfin–Colina,* 464 F.3d 392, 397 (3d Cir. 2006)). The Government bears the burden of showing that the requirement of reasonable suspicion has been met. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, *i.e.,* the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable.") (citations omitted)).

"A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation." *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 788 (2009). "The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Ibid.* "Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Ibid.* "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez*, 135 S. Ct. at 1614 (citations omitted). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Ibid.*

"Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Id.* at 1615 (quoting *Caballes,* 543 U.S., at 408). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* at 1615 (citations omitted). "Furthermore, questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop." *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003). Inquiries and delays incident to an officer's safety also fall within permissible scope of a traffic stop because "the government's officer safety interest stems from the mission of the stop itself." *Rodriguez,*

135 S. Ct. at 1616. "Traffic stops are 'especially fraught with danger to police officers,' so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Id.* (quoting *Johnson,* 555 U.S. at 330).

Ordinary inquiries do not include "measure[s] aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Rodriguez,* 135 S. Ct. at 1615 (quoting *City of Indianapolis v. Edmond,* 531 U.S. 32, 40–41 (2000)). "On-scene investigation into other crimes" "detours" from the mission of enforcing the traffic laws and ensuring officer safety inherent in each traffic stop. *Id.* at 1616. *See also id.* at 1616 ("Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general."). For example, the Supreme Court has explained that traffic checkpoints with the primary purpose of policing borders or ensuring roadway safety comply with the Fourth Amendment in the absence of individualized suspicion, while those searching for the possession of illegal narcotics in particular — a form of ordinary criminal wrongdoing — do not. *City of Indianapolis,* 531 U.S. at 41–42. *See also Florida v. Jardines,* 133 S. Ct. 1409, 1416 (2013) ("Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics.").

Once a valid traffic stop has been initiated, however, "'an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation.'" *Lewis,* 672 F.3d at 237 (quoting *Givan,* 320 F.3d at 458 (citation omitted)). "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez,* 135 S. Ct. at 1615 (citations omitted).

The contours of "reasonable suspicion" have been thoroughly outlined by the Supreme Court and the Third Circuit. "An inchoate hunch does not satisfy the standard of reasonable suspicion; rather, the Fourth Amendment requires that law enforcement have 'some minimal level of objective justification for making the stop.'" *Thompson*, 772 F.3d at 758 (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989)). *See also United States v. Cortez,* 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). This level of suspicion is "less than proof of wrongdoing by a preponderance of the evidence [and] . . . less demanding than that for probable cause." *Sokolow,* 490 U.S. at 7 (internal citations omitted).

"'In determining whether there was a basis for reasonable suspicion, a court must consider the totality of the circumstances, in light of the officer's experience.'" *Thompson*, 772 F.3d at 758 (quoting *Givan,* 320 F.3d at 458). S*ee also United States v. Arvizu,* 534 U.S. 266, 273 (2002) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.") (citing *Cortez,* 449 U.S. at 417–18). "[T]he totality of the circumstances standard enables 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Thompson*, 772 F.3d at 758 (quoting *Arvizu,* 534 U.S. at 273). Further, while "the individual factors giving rise to reasonable suspicion may be innocent in isolation, together they must serve to eliminate a substantial portion of innocent travelers." *United States v. Mathurin,* 561 F.3d 170, 174 (3d Cir. 2009) (quoting *Karnes v. Skrutski,* 62 F.3d 485, 493 (3d Cir.1995)) (internal quotation marks omitted). "Thus, courts are

not permitted to analyze factors individually, as innocent factors taken together may appear suspicious to an experienced officer." *Thompson*, 772 F.3d at 758-59 (citing *Terry v. Ohio,* 392 U.S. 1, 22–23 (1968)).

"Where reasonable suspicion for the traffic stop" or, in this case, the extension of the stop to include investigation beyond the ordinary inquiries incident to the traffic stop, "is lacking, the evidentiary fruits of the traffic stop must be suppressed." *Lewis*, 672 F.3d at 237 (citing *United States v. Johnson,* 592 F.3d 442, 447 (3d Cir. 2010)).

A. Reasonable Suspicion for the Traffic Stop

Turning to the first inquiry here, Defendant does not contest that Officer Bradley possessed reasonable suspicion to initiate the traffic stop of Roberts' vehicle. Mot. 4. Officer Bradley observed several motor vehicle violations by Roberts, including driving at night without headlights, driving while using a cellular phone, and driving with an obstructed view, and Roberts himself admitted that he had in fact committed the observed violations. In this case, therefore, there is no question that the traffic stop itself was legitimate under the Fourth Amendment. Instead, Defendant argues that Officer Bradley unconstitutionally prolonged the traffic stop, when he began questioning Roberts about his criminal record after having already obtained Roberts' valid driver's license and proof of insurance, having confirmed that there were no outstanding warrants for Roberts' arrest or for any traffic tickets, and having confirmed that the vehicle Roberts was driving was not reported stolen and had a current, valid registration in the name of a woman with the same surname as Roberts, who shared Roberts' home address.

In order to determine whether Officer Bradley's conduct in continuing the questioning of Roberts impermissibly prolonged the traffic stop, the Court conducts two inquiries. First, the Court evaluates whether the questioning fell within the scope of the "ordinary inquiries" incident

to a traffic stop. *Rodriguez*, 135 S. Ct. at 1615. Second, if the questioning falls outside the scope of ordinary inquiry, the Court looks to determine whether the officer possessed reasonable suspicion to investigate other potential criminal wrongdoing. *Ibid.*

B. Ordinary Inquiries Incident to the Traffic Stop

Here there is no dispute that Officer Bradley's initial conduct, from DCV 00:10:30 to 00:16-54, consisted of ordinary inquiries incident to a valid traffic stop. He obtained and reviewed Roberts' driver's license and proof of insurance, checked for any outstanding warrants for Roberts, checked Roberts' criminal record, and ran the vehicle's license plate in order to confirm the validity of the registration and Roberts' authority to drive the car. *Rodriguez*, 135 S. Ct. at 1615. Similarly, as the Court noted on the record during oral argument, Officer Bradley's subsequent questioning concerning Roberts' travel plans and route were also permissible, ordinary inquiries. DCV 00:17:14-00:17:19; *Givan*, 320 F.3d at 459. However, Officer Bradley's intervening questioning concerning the timing and nature of Roberts' past arrests does not fall within the category of ordinary inquiry identified by the Supreme Court and the Third Circuit. DCV 00:16:54-00:17:14.

At the time that Officer Bradley asked about Roberts' past arrests, Officer Bradley was already aware of Roberts' criminal record, including arrests for drug activity, having reviewed Roberts' record through the mobile data terminal at DCV 00:12:22-00:16:44. The purpose of Officer Bradley's questioning therefore could not have been to inquire about the existence of Roberts' criminal record, which was already established, or the presence of outstanding warrants, which had already been ruled out. Additionally, there has been no suggestion in this case by the Government or any party that Roberts' past arrests were relevant to the motor vehicle infractions for which Roberts was stopped, nor otherwise related to the mission of promoting road and

traffic safety. *Rodriguez*, 135 S. Ct. at 1614. Similarly, the Government has not argued, and there is no evidence to support that Officer Bradley felt threatened in any way such that additional questioning might be justified by the officer's general safety interest. *Id.* at 1616. At DCV 00:16:54, therefore, there were no outstanding questions related to the traffic stop itself meriting further inquiry, and the only step remaining to complete the stop was for Officer Bradley either to issue summons for the motor vehicle violations or allow Roberts to leave with a warning. Roberts ultimately was allowed to leave at DCV 01:00:00-01:06:00 with summons only for the initially observed motor vehicle violations being issued and without summons for any other offense relating to questioning taking place at or after DCV 00:16:54, meaning that, as events in fact unfolded, the traffic stop was complete for all purposes at DCV 00:16:54. Officer Bradley's inquiry into the number, nature, and dates of Roberts' past arrests, in context, thus was a "measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing,'" outside of the core mission of a standard traffic stop. *Rodriguez*, 135 S. Ct. at 1615 (quoting *City of Indianapolis,* 531 U.S. at 40–41).

## C. Reasonable Suspicion for Extension of the Traffic Stop

As noted above, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns. . . . Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 135 S. Ct. at 1614. Because the mission of the traffic stop in this case was completed at DCV 00:16:54, when Officer Bradley returned to Roberts' vehicle after conducting the ordinary inquiries incident to the stop, his authority arising from the valid traffic stop to continue holding Roberts — and his vehicle in which Defendant was traveling as a passenger — terminated at that time. Officer

Bradley may only have continued to detain Roberts and ask the questions concerning Roberts' criminal history unrelated to the traffic stop if he had reasonable suspicion to justify continuing the Fourth Amendment seizure. *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (citations omitted).

As the Court noted on the record during oral argument, Officer Bradley clearly had reasonable suspicion to justify continued investigation at many points in the traffic stop *after* his initial questioning about Roberts' past arrests at DCV 00:16:54. For example, it is undisputed that he had reasonable suspicion to justify continued questioning after he smelled marijuana emanating from the passenger's side of Roberts' vehicle. DCV 00:22:10; *see United States v. Bell*, 483 F. App'x 716, 718 (3d Cir. 2012) (reasonable suspicion established where officer smelled marijuana upon approaching passenger's side of vehicle). Additionally, the inconsistent stories provided by Roberts and Defendant on their past association and trip itinerary provided reasonable suspicion for continued investigation. DCV 00:22:20-00:24:09; *see United States v. Comegys*, 504 F. App'x 137, 142 (3d Cir. 2012) (reasonable suspicion established where driver and passenger provided different trip itineraries). In fact, reasonable suspicion could have developed shortly after the challenged questioning when confusion arose concerning the address of Roberts' mother, in whose name the car was registered. DCV 00:17:19-00:18:09. Roberts contended that the car was registered to his mother, who lived in Plainfield. The registration clearly showed the minivan to be registered to a woman in New Brunswick. The recording of the traffic stop shows that Officer Bradley calmly and professionally attempted to elicit an explanation for this inconsistency from Roberts, who became agitated and did not directly respond for a significant period time, during which time Roberts was also communicating via speakerphone with another party, adding to the general confusion of the scene. *Ibid.* The

question before this Court on the present motion, however, is whether Officer Bradley had reasonable suspicion to continue to question Roberts *before* he launched into the, admittedly brief, line of questioning on Roberts' past arrests at DCV 00:16:54.

1. No *De Minimis* Exception

As a threshold matter, this Court notes, as the Government noted at oral argument, that the amount of time in question is very brief, roughly twenty seconds of off-mission questioning. In *Rodriguez*, however, the Supreme Court made clear that there is no *de minimis* exception to the Fourth Amendment during traffic stops. *Rodriguez*, 135 S. Ct. at 1615 (rejecting the Eighth Circuit's rule that a *de minimis* intrusion into a driver's Fourth Amendment rights, *e.g.* the extension of a traffic stop for a matter of seconds or a few minutes, was permissible). The Supreme Court's ruling clarified the meaning of that Court's holding in *Johnson*, that inquiries unrelated to the core mission of the traffic stop may "not measurably extend the duration of the stop" in the absence of independent, reasonable suspicion. *Johnson*, 555 U.S. at 333. Here, it is inarguable that Officer Bradley's questions to Roberts concerning the number, nature, and timing of Roberts' past arrests measurably extended the duration of the stop, even though the extension was very slight. To hold otherwise would be to endorse a rule that any person with a criminal record may be interrogated by law enforcement officers about his or her past arrests without reasonable suspicion of criminal wrongdoing, so long as the questioning is brief. *Rodriguez* does not permit such an interpretation of the Fourth Amendment. The Court therefore must continue to the question of whether the extension was justified by reasonable suspicion.

2. Totality of the Circumstances

Reviewing the evidence in the record in this case, it is clear that, given the totality of the circumstances, Officer Bradley did not possess reasonable suspicion to question Roberts on

matters outside of the ordinary inquiries incident to a traffic stop, when he asked about Roberts'

past arrests at DCV 00:16:54. At the time such questioning began, Officer Bradley had already

determined that Roberts had a valid driver's license and proof of insurance. Officer Bradley had

checked Roberts' criminal history and determined that there were no outstanding warrants for

Roberts' arrest. Officer Bradley had been told by Roberts that the vehicle was registered to

Roberts' mother. DCV 00:11:05. The registration check Officer Bradley conducted returned a

vehicle registration to a woman sharing Roberts' surname, residing at the same address listed on

Roberts' driver's license. *See also* Title/Lien Certification. The registration record was thus

completely consistent with Roberts' account that the car was registered to his mother, as it is

common knowledge that parents and children frequently share the same surname, and that family

members often reside at the same address. Additionally, Officer Bradley had already explained

the traffic violations for which Roberts had been stopped, and Roberts had admitted to driving at

night without his headlights activated. Moreover, the Government does not contend, and the

recording does not support, that Roberts' behavior to this point was in any way suspicious or

inappropriate. Accordingly, upon returning to Roberts' vehicle at DCV 00:16:54, the only task

left to complete the traffic stop was for Officer Bradley to either write Roberts a ticket, or let him

go without writing one. As it happened, Roberts was ultimately written tickets only for driving

without headlights, using a cellphone while driving, and obstruction of view, the motor vehicle

offenses that Officer Bradley had observed before the initiation of the stop, and about which

Officer Bradley had already informed Roberts at DCV 00:11:48, before running the title search

and reviewing Roberts' criminal record. No ticket was ultimately written for any offense

concerning the *registration or ownership* of Roberts' vehicle, which was the primary subject of

questioning after the completion of the title search and criminal record check and after the stop

had already been extended by Officer Bradley's questioning Roberts concerning his past arrests at DCV 00:16:54-17:14. In short, Officer Bradley's investigation into the offenses that were actually ticketed was substantially complete upon his observation of those offenses and his initial interaction with Roberts. The subsequent questioning unrelated to driving without headlights, using a cellphone while driving, and obstruction of view, did not give rise to any summons. Given these circumstances, at DCV 00:16:54, the officer could not have formed a reasonable suspicion justifying continued investigation into other criminal activity. Accordingly, the evidence seized after Officer Bradley lacked reasonable suspicion to extend the traffic stop must be suppressed as the fruit of an unconstitutional seizure. *Lewis*, 672 F.3d at 237. The Court therefore suppresses the evidence of the handgun recovered from Defendant in this case.

The Third Circuit has not yet interpreted the significance of *Rodriguez* in a reported decision. This Court's holding is, however, consistent with the very limited body of post-*Rodriguez* persuasive precedent from the Third Circuit. For example, in *United States v. Byrd*, No. 16-1509, 2017 WL 541405 (3d Cir. Feb. 10, 2017), an officer pulled over a vehicle for traffic violations and extended the duration of the stop to include a K-9 search for drug activity. When the search led to an arrest and drug charges, the driver challenged the extension of the stop under the Fourth Amendment. In the stop in *Byrd*, when the officer approached the vehicle and asked for the driver's documents, the driver "appeared nervous and conspicuously avoided opening a center console even though [the driver] had difficulty locating the requested documents." *Id.* at * 1. Ultimately, the driver "produced an interim New York driver's license that did not include a photo" as well as a rental agreement that did not list the driver as a renter or permitted driver. *Id.* at *1. When the officer ran a check of the driver's license, and a criminal background check, he discovered that the name on the license was an alias, used by the driver,

who had an extensive criminal history of drug, weapon, and assault charges. *Id.* at *1. The Third Circuit affirmed the district court, finding "[t]he . . . officer's observation of Byrd's nervous avoidance of the center console coupled with Byrd's non-photographic identification, his use of an alias, and the absence of his name on the rental agreement gave rise to additional suspicion of other criminal activity." *Id.* at *3. In *Byrd*, therefore, the officer began developing reasonable suspicion from the moment of his first interaction with the driver — observing the driver's suspicious behavior and his provision of non-photographic identification — and had completely developed it by the time he completed his ordinary checks incident to the traffic stop into the driver's background — discovering the alias and criminal history, and finding that the driver was not an authorized driver of the vehicle under the rental agreement. The officer, therefore, had reasonable suspicion *before* requesting the additional investigation into criminal activity outside of the traffic stop, in that case a K-9 search for illegal drug activity. Here by contrast, the only factor that could have given rise to reasonable suspicion in Officer Bradley's initial interaction with Roberts prior to DCV 00:16:54, was Roberts' failure to provide a registration card. Roberts, however, explained that the car was registered to his mother and he simply could not locate the document. Officer Bradley then offered to, and in fact did, run the license plate of the vehicle to locate the registration, and found a document which confirmed Roberts' story. Unlike *Byrd*, therefore, at the completion of the ordinary checks incident to the traffic stop in this case, Officer Bradley's basis for reasonable suspicion of other criminal activity had dissipated, not coalesced.

In the other two persuasive precedents from the Third Circuit, post-*Rodriguez*, the evidence of reasonable suspicion also developed prior to the officer's extension of the stop. In *United States v. Frierson*, 611 F. App'x 82, 84 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 1159, 194 L. Ed. 2d 187 (2016), the driver of the vehicle detained in a traffic stop produced an expired

rental agreement in which the driver was not listed as an authorized driver. *Id.* at 84. The driver's criminal background check also returned convictions for violent crimes including voluntary manslaughter as well as possession of an assault weapon and body armor. *Id.* at 84. The Third Circuit found that these facts rendered reasonable the officer's delay to wait for back-up out of safety concerns, and provided reasonable suspicion for the officer's continued inquiry into who was authorized to drive the rental car. *Id.* at 85. Again, therefore, it was the results of the ordinary inquiries incident to the traffic stop which gave rise to the safety concerns and reasonable suspicion of other criminal activity. Here, there were no safety concerns, and Officer Bradley's check of the vehicle registration was *consistent* with Roberts' claim of authorization to drive the vehicle. Finally, in *Morgan v. Borough of Fanwood*, No. 16-3113, 2017 WL 815220 (3d Cir. Mar. 1, 2017), the officer smelled marijuana during his initial interaction with the driver during a traffic stop, creating reasonable suspicion for further investigation of drug crime. *Id.* at *5. Here, it is undisputed that Officer Bradley's smelling of marijuana emanating from the passenger's side of the vehicle created reasonable suspicion to search Defendant at DCV 00:22:10, but this suspicion arose long after the stop had already been extended without the Officer smelling any marijuana from the driver's side at DCV 00:16:54. The available persuasive guidance from the Third Circuit, therefore, is consistent with the suppression of evidence here.

IV. CONCLUSION

     Accordingly, for the reasons stated above, the Court concludes that evidence of the handgun seized from Defendant on February 21, 2016, must be suppressed as obtained in violation of Defendant's Fourth Amendment rights.

Dated: _____8/7/2017_____       _/s/ Freda L. Wolfson_____
                                          The Honorable Freda L. Wolfson
                                         United States District Judge